## ASA P. KNIGHT *vs.* SAMUEL S. BLACKFORD.

LAW. No. 23,069.

Decided March 17, 1884.
The CHIEF JUSTICE and Justices Cox and JAMES sitting.

1. Words which do not disparage the character of the plaintiff are not actionable, although special damage flow from the uttering of them.
2. Where A tells B that C, a Government clerk, had spoken disrespectfully of his chief, D, and this coming to the ears of D, he discharges C from office, it *seems* that the damages are too remote to enable C to maintain an action of slander against A.

THE CASE is stated in the opinion.

L. G. HINE for plaintiff.

COOK & COLE for defendant.

Mr. Justice Cox delivered the opinion of the court.

This is an action for slander. I will read the declaration:

"The plaintiff sues the defendant for that, whereas, the defendant, before the committing of the grievances by the defendant, as hereinafter stated, had been for several years and was employed as a clerk in the Sixth Auditor's office of the Treasury Department of the United States, at a salary of $1,600 per annum, and in that capacity had behaved and conducted himself with industry, civility and good temper, and was never guilty of nor until the committing of the said grievances was suspected of incivility or of speaking disrespectfully of his superiors in office.

"By means of which said several premises, the plaintiff had deservedly gained the good opinion of his neighbors, his fellow clerks, and other good and worthy citizens of said District to whom he was known; and had not only gained such good opinion, but had been able to support himself and family by his honest, diligent and faithful service as clerk as aforesaid; yet the defendant, well knowing the premises, but maliciously contriving and falsely and fraudulently intending to injure the plaintiff in his standing as a clerk in the department aforesaid, and to cause him to be removed therefrom, and thereby deprive him of the means of support-

ing himself and family, heretofore, to wit, in and about the month of June, 1880, at the city of Washington, in the District of Columbia, without probable cause, wrongfully, maliciously and injuriously spoke and published of and concerning the plaintiff, in a conversation with M. D. Montis, J. L. Doty, H. A. Cobaugh and others, the false, scandalous, malicious and defamatory words following, that is to say: That the plaintiff had said to the defendant, that the honorable John Sherman, then Secretary of the Treasury of the United States, had bought up Sayles J. Bowen, of this District, as a delegate to the Republican National Convention at Chicago, Illinois, in the year 1880, after the said Bowen had been chosen such delegate; and further, that the honorable John Sherman, while Secretary of the Treasury, and before the meeting of the said convention, had detailed a clerk in the loan division of the Treasury Department to go to the State of North Carolina for the purpose of organizing 'Sherman Clubs' in that State. 'That Secretary Sherman had sent some of his clerks down south with money to buy delegates to Chicago,' thereby meaning that the plaintiff had accused the honorable John Sherman, Secretary, etc., with having resorted to fraudulent and corrupt means to secure the republican nomination for the Presidency of the United States.

"And the plaintiff further avers, that the defendant, out of personal malice, further contriving and intending to injure him as aforesaid, did, in the conversation aforesaid, maliciously, and without probable cause, utter the false, scandalous, defamatory words, following, that is to say: That the plaintiff had said to him, the defendant, that Mr. James F. Herring, late Deputy Second Auditor of the Treasury Department of the United States, had assessed money contributions on clerks in his office as the price of their promotion, with the knowledge and consent of E. B. French, then Second Auditor of the Secretary, and that Mr. French, while holding said office of Second Auditor, had compelled a clerk in his office to purchase for him, French, a horse and buggy as the price of his, the said clerk's, office; thereby meaning

that the plaintiff had accused Mr. French, then Second Auditor of the Treasury, and his deputy, of corruption in office. By means of said malicious, false and defamatory statements, the plaintiff was, on the 15th day of July, 1880, discharged from his said office, to his great damage and injury.

"And the plaintiff further avers, that, after he had been unjustly removed from his office as aforesaid, and being innocent of said charges, he made application to be reinstated, and the defendant, learning of his efforts in that behalf, and not satisfied with having, by means of his false and scandalous statements aforesaid, succeeded in causing his dismissal from said office, but further contriving and maliciously intending to injure him, did, in and about the month of August, 1880, out of personal malice, and with a view to prevent favorable action on the plaintiff's application for reinstatement, reiterate his said false, scandalous and defamatory charges in writing, and filed the same with Mr. Lamphere, then Appointment Clerk of the Treasury Department of the United States, and this had the effect of delaying his reinstatement.

"And the plaintiff further avers, that, after the defendant had filed the written statement aforesaid, and while the plaintiff was endeavoring to be reinstated in his said office, from which, in consequence of said false statements, he had been unjustly removed, the defendant, in conversation with the honorable J. M. McGrew, Sixth Auditor of the Treasury Department of the United States, with the view of preventing favorable action on the plaintiff's application for reinstatement, maliciously, and without probable cause, spoke of and concerning the plaintiff, the false, malicious, scandalous and defamatory words following: "There is one of the clerks in your office (meaning the plaintiff) who is circulating reports about you that will do you harm. I do not want to make any trouble, but I thought you ought to know it. During your sickness last winter, I inquired of him how you were, and he laughed at me, and I asked him why he laughed. He replied: There is nothing ails him (the Hon. J. M. McGrew) but women and bad whiskey;

meaning thereby that the plaintiff had accused the Hon. J. M. McGrew with being a person of inebriate and lascivious habits. By means of said false, scandalous and defamatory words, so spoken as aforesaid, the plaintiff's reinstatement as a clerk aforesaid was further delayed, to his great damage and injury.

"And the plaintiff further avers, that the Hon. John Sherman, Secretary of the Treasury as aforesaid, after considering the written statement filed by the defendant with Mr. Lamphere as aforesaid, and after hearing the plaintiff touching said statements, considered the same were not true, and thereupon, on the 1st day of August, 1881, caused him to be reinstated as a clerk in the Sixth Auditor's office aforesaid."

This declaration was demurred to, and the demurrer was sustained on the following grounds: First, that the language alleged to have been used is not actionable; and, secondly, that the damages claimed are too remote. From the decision on the demurrer the plaintiff appealed.

We understand that there are two classes of words that are slanderous; one class consisting of words which are actionable *per se*, and the other, those which are actionable if it be shown that their publication has occasioned special damage to the plaintiff. Words which impute a crime that is punishable criminally, or which assert that a party is unfit for his office or calling in life, or which impute to him some contagious disease that may cause him to be avoided, are all words actionable in themselves. But to say of a man, generally, that he is a rascal, or a scamp, or a dishonest man, is not actionable unless it be proved that some special damage resulted from the use of the language, as, for example, that it caused him the loss of employment. If special damage results, then it is necessary for the plaintiff to aver and prove that fact. Actions of that sort are called *per quod* actions.

In this case, it is not claimed that the language was actionable *per se*, but that it was actionable by reason of the special damage alleged to have resulted from its use. In

these *per quod* actions it is not only necessary to show that the language did produce actual damage, but it must appear to be defamatory and scandalous. This rule, which is laid down in the text books, is also well stated in the case of Terwilliger *v.* Wands, 17 N. Y., 60, where the court says:

"There must be some limit to liability for words not actionable *per se,* both as to the words and the kind of damages; and a clear and wise one has been fixed by the law. The words must be defamatory in their nature; and must in fact disparage the character; and this disparagement must be evidenced by some positive loss arising therefrom directly and legitimately as a fair and natural result. In this view of the law, words which do not degrade the character do not injure it and cannot occasion loss. In Cook's Law of Defamation (page 24), it is said: 'In order to render the consequence of words spoken special damage, the words must be in themselves disparaging; for if they be innocent the consequence does not follow naturally from the cause.' In Kelly *vs.* Partington, 5 Barn. & Adolph., 645, which was an action for slander, the words in the declaration were: 'She secreted 1s. 6d. under the till, stating that these are not times to be robbed.' It was alleged as special damage, that by reason of the speaking of the words a third person refused to take the plaintiff into service. The plaintiff recovered one shilling damages, and the defendant obtained a rule *nisi* for arresting the judgment on the ground that the words, taken in their grammatical sense, were not disparaging to the plaintiff, and, therefore, that no special damage could result from them. Denman, C. J., said: 'The words do not, of necessity, import anything injurious to the plaintiff's character, and we think the judgment must be arrested unless there be something on the face of the declaration from which the court can clearly see that the slanderous matter alleged is injurious to the plaintiff. Where the words are ambiguous, the meaning can be supplied by inuendo; but that is not the case here. The rule for arresting the judgment must therefore be made absolute.' Littledale, J., said: 'I cannot agree that words laudatory of a

party's conduct would be the subject of an action if they were followed by special damage. They must be defamatory or injurious in their nature. In Comyn's Digest, title 'Action on the Case for Defamation,' D, 730, it is said generally that any words are actionable by which the party has especial damage; but all the examples given in illustration of the rule, are of words defamatory in themselves but not actionable because they do not subject the party to a temporal punishment. In all instances put, the words are injurious to the reputation of the person of whom they were spoken.' Taunton, J., said: 'The expression ascribed to the defendant, *These are no times to be robbed*, seems to be saying the times are so bad I must hide my money. If Stenning refused to take the plaintiff into his service on this account, he acted without reasonable cause; and, in order to make the words actionable, they must be such that special damage may be the fair and natural result of them.' Patterson, J., said: 'I have always understood that the special damage must be the natural result of the thing done, &c. It is said that the words are actionable because a person, after hearing them, chose, in his caprice, to reject the plaintiff as a servant. But if the matter was not in its nature defamatory, the rejection of the plaintiff cannot be considered a natural result of the speaking of the words. To make the speaking of the words wrongful, they must, in their nature, be defamatory. Vicars *vs.* Wilcocks, 8 East, 1.' It necessarily follows from the rule, that the words must be disparaging to the character; that the special damage, to give an action, must flow from disparaging it. In the case last cited, the plaintiff actually suffered damage from the defendant's words by their bringing her into disrepute. But the words were not calculated to produce such result, and, therefore, the action would not lie."

This proposition might be further illustrated by supposing that I should go to the Secretary of the Treasury, and say to him that a certain clerk in his department was in affluent circumstances and did not need office, and that I, on the other

hand, did need it; that the Secretary should then turn him out on the strength of that statement, and put me in. That would be a damaging statement on my part, and yet no action for slander could be based upon it. So that the question which meets us on the threshhold of the case is, whether the words alleged in this declaration were defamatory and scandalous.

. . It will be observed that the defendant is not charged with saying anything about the plaintiff's character, but with saying that the plaintiff disparaged somebody else's character; that is to say, that of the Secretary of the Treasury, and that of some of his subordinates. It is not even complained that the defendant accused the plaintiff of falsehood in making these charges against the Secretary and others. If they were true, the plaintiff would have had a right to make them. The declaration does not complain that the defendant even imputed false statements to the plaintiff, much less any more serious moral delinquency. The words, therefore, do not disparage the character of the plaintiff at all, and we cannot conceive how an action can be grounded upon allegations that impute nothing wrong.

Independently of that, there is another difficulty about the case. The allegations, on the strength of which it is said that the plaintiff was removed from office, were not made to the Secretary of the Treasury, but to third persons whose names are given in the declaration, viz., Montis, Doty, Cobaugh and others. Certainly, the representations to them did not lead to the plaintiff's dismissal from office, because they had no power to remove him. There is a gap in the proof somewhere. Some other agency must be brought in to connect the alleged slander with the removal from office. The rule of law is, that the plaintiff can only recover for the direct and immediate consequences of the acts complained of. The dismissal from office could not have been the direct and immediate consequence of the representations made by the defendant to third persons who had no power of removal. Somebody else must have interposed and repeated this alleged slander to the Secretary of the Treasury, which repe-

tition was the immediate and proximate cause of the wrong complained of. The authorities are to the effect that the *repetition* of slander, if that leads to the result, and not the *original* utterance of it, is the *immediate* and proximate cause of the injury. The case I already referred to, Terwilliger *vs.* Wands, decides that point, and refers to a number of cases in support of it. That would apply to the representations, on the strength of which it is said the plaintiff was removed from office. The other representations, that are said to have delayed his reinstatement in office, which were made directly to the appointment clerk and to the Sixth Auditor, do not come within this rule, but all the representations complained of fall short of being actionable, because they are not defamatory and slanderous in their character.

With these views we are constrained to hold that the demurrer was properly sustained, and judgment must be affirmed.